# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIVIA GONZALEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED OF OMAHA LIFE INSURANCE COMPANY,<br><br>　　　　Defendant. | Case No. CV 12-02002 BRO (SPx)<br><br>**FINDINGS OF FACT AND CONCUSIONS OF LAW AFTER COURT TRIAL** |

## I. INTRODUCTION

This action falls under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* On March 1, 2010, Plaintiff Olivia Gonzalez enrolled in a group life insurance plan administered by Defendant United of Omaha Life Insurance Company. At that time, she elected coverage under the policy for herself and her dependent husband, Roberto Gonzalez. On August 21, 2011, Mr. Gonzalez died. One month later, Plaintiff submitted to Defendant a claim to receive benefits under the policy. After requesting additional information from Plaintiff, Defendant determined that Mr. Gonzalez was not covered under the policy, and therefore no benefits were payable.

In making this determination, Defendant relied on a provision of the insurance policy that excluded coverage for physically disabled dependents. Specifically, the provision indicates that the policy will not take effect for a physically disabled dependent if the dependent is (1) "unable to perform all the usual and customary duties and activities of a person who is the same age and sex who is in good health"; or (2) "not able to engage in any work or occupation for wage or profit." The provision does, however, permit coverage to become effective for a once-disabled dependent after that dependent is no longer disabled. With respect to Mr. Gonzalez, Defendant found that he was disabled as of the policy's effective date—March 1, 2010—and continuously until the day he died. Defendant based its finding on a form prepared by Mr. Gonzalez's primary-care physician, Dr. Hwang, which indicated that since 2007 Mr. Gonzalez had been suffering from chronic Hepatitis C, liver cirrhosis, and liver cancer. In Dr. Hwang's opinion, Mr. Gonzalez was "totally disabled to the extent that he . . . was thereby prevented from engaging in any occupation or employment." Dr. Hwang further indicated that the "disability exist[ed] continuously from the date [Mr. Gonzalez] first became disabled [in 2007] until his . . . death [in August 2011]."

After Defendant's initial denial, Plaintiff appealed for review. She asserted that, although Mr. Gonzalez had a medical condition, he was able to perform daily activities and was not confined to his home or bed. She further asserted that her husband had been actively looking for work through June 2010, and provided proof that he had been receiving unemployment compensation.

In response, Defendant requested all of Mr. Gonzalez's medical records. After reviewing Dr. Hwang's form, Mr. Gonzalez's medical records, and the unemployment compensation records that Plaintiff provided, Defendant determined that the denial of benefits was appropriate because Mr. Gonzalez was ineligible due to his disability.

Believing that Defendant wrongfully withheld benefits due under the life insurance policy, Plaintiff filed the instant action. She now seeks review of Defendant's denial of policy benefits.

After a *de novo* review of the record and argument of counsel, the Court finds that Plaintiff is not entitled to any benefits under the policy, and consequently Defendant's denial was appropriate. Accordingly, judgment is for Defendant.

## II. <u>FINDINGS OF FACT</u>[1]

### A. <u>The Parties</u>

Plaintiff Olivia Gonzalez is an employee of Family Service Association. (*See* Fetter Decl. Ex. C, at 3194.) At some point, Defendant United of Omaha Life Insurance Company issued to Family Service Association a group policy for term life insurance (No. GVTL-AFM9). The policy became effective on March 1, 2010. (Fetter Decl. Exs. A–B.) On February 4, 2010, Plaintiff submitted an application to

---

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law. Plaintiff makes various evidentiary objections to Defendant's trial brief. (Dkt. No. 50-1.) Specifically, she objects to Defendant's references to definitions of common medical terminology (for which Defendant often cites Internet-based sources like www.webmd.com) or its opinion regarding Mr. Gonzalez's condition or ability to seek work. (*See* Dkt. No. 50-1.) The Court does not rely on Defendant's definitions or opinions, however, and therefore Plaintiff's objections are OVERRULED.

3
FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

1 enroll in the plan.  (Fetter Decl. Ex. C, at 3192.)  She elected to enroll herself and her
2 dependent husband, Roberto Gonzalez.  (*Id.*)  In the event of her husband's death,
3 Plaintiff elected a $50,000 benefit amount.  (*Id.*)  At that time, Roberto Gonzalez was
4 56 years old.  (*See id.*)

### B. Roberto Gonzalez's Illness and Death

In January 2006, Roberto Gonzalez was diagnosed with chronic Hepatitis C of unknown etiology.  (*See* Fetter Decl. Ex. C, at 993, 3180.)  On October 8, 2007, he was diagnosed with moderately differentiated hepatocellular carcinoma—cancer of the liver.  (*See, e.g.*, Fetter Decl. Ex. C, at 993, 2409.)  In July 2009, one of Mr. Gonzalez's doctors indicated the cancer was relatively benign in nature, as he had, after 2 years, exceeded the median survival rate.  (Fetter Decl. Ex. C, at 2579.)

In December 2009, Mr. Gonzalez was admitted to the hospital because he had "multiple [7] episodes of hematemesis"—vomiting of blood.  (Fetter Decl. Ex. C, at 1557, 1563.)  Medical records indicate that he had a "history of [upper gastrointestinal bleed[ing]."  (Fetter Decl. Ex. C, at 1563.)  As part of his treatment, he received gastric intubation and a transfusion of blood platelets.  (Fetter Decl. Ex. C, at 1558, 1560.)  Doctors indicated his "overall condition[ and ] prognosis remain[ed] guarded."  (Fetter Decl. Ex. C, at 1562.)  When discharged, Mr. Gonzalez was "[a]ble to walk with no problem."  (Fetter Decl. Ex. C, at 1564.)  He was encouraged to "[k]eep [himself] active to avoid infection and deconditioning."  (Fetter Decl. Ex. C, at 1572.)  But his recommended activity level was "as tolerated."  (Fetter Decl. Ex. C, at 1571.)

On February 5, 2010, Mr. Gonzalez underwent an endoscopic procedure to treat sores in his esophagus.  (Fetter Decl. Ex. C, at 1939–40.)  Three weeks later, on February 24, 2010, Mr. Gonzalez met with his oncologist, Dr. Kashani.  The doctor affirmed that his liver cancer was "unresectable," meaning that it could not be physically removed (cut out) through surgery.  (Fetter Decl. Ex. C, at 2579–80.)

That same day, February 24, 2010, Dr. Kashani also opined that Mr. Gonzalez's prognosis was poor.  (Fetter Decl. Ex. C, at 2580.)

Mr. Gonzalez visited Dr. Kashani again on April 13, 2010, for significant weight loss.  (Fetter Decl. Ex. C, at 2697–98.)  Dr. Kashani prescribed him medication to improve his appetite.  (Fetter Decl. Ex. C, at 2698.)

On April 17, 2010, Mr. Gonzalez was again admitted to the hospital.  (Fetter Decl. Ex. C, at 993–1002.)  He was treated for sepsis, which is a bacterial infection.  (Fetter Decl. Ex. C, at 993.)  During his stay, Mr. Gonzalez discussed with physicians his "code status" and "advance care planning."  (Fetter Decl. Ex. C, at 993–996.)  They also discussed the option of "home palliative care as a treatment option and a means to reduce likely increasing of hospitalization."  (Fetter Decl. Ex. C, at 996.)  Upon discharge a week later, the hospital was going to provide Mr. Gonzalez with a wheelchair, but Plaintiff indicated they already had borrowed one; Mr. Gonzalez also had a cane at home.  (Fetter Decl. Ex. C, at 997, 1002.)

One and a half months later, on May 28, 2010, Mr. Gonzalez met with Dr. Kashani.  (Fetter Decl. Ex. C, at 2408.)  They discussed the worsening condition of his liver, and Mr. Gonzalez and Plaintiff indicated that they "wish[ed] to continue the best supportive care."  (*Id.*)

On August 21, 2011, Roberto Gonzalez died of multi-system organ failure.  (Fetter Decl. Ex. C, at 3195.)  He was 58 years old.  (*See id.*)

### C. The Policy's Exclusion for Disabled Dependents

The policy that Defendant issued to Family Service Association, and in which Plaintiff and her husband enrolled, contains a provision excluding coverage for any dependent who is confined for health reasons, or is mentally or physically disabled.  (*See* Fetter Decl. Ex. B, at 46–47.)  Specifically, it provides,

> Insurance for a Dependent . . . who is confined:
> (a) in a Hospital as an inpatient;
> (b) in any institution or facility other than a Hospital; or

5
FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

>            (c) at home and currently under the care or supervision of
>                a Physician;
>        on the day insurance is to begin will not take effect until such
>        confinement ends or is no longer medically necessary.
>        . . .
>        Insurance for a Dependent who is physically or mentally disabled to
>        the extent such Dependent is unable to perform all of the usual and
>        customary duties and activities of a person who is the same age and
>        sex who is in good health or is not able to engage in any work or
>        occupation for wage or profit will not take effect until the Dependent
>        is able to fully resume all usual and customary duties and activities or
>        is able to work for wage or profit.

(Fetter Decl. Ex. B, at 47.) The policy also defines the terms "disabled" and "sickness." "**Total Disability, Totally Disabled or Disabled** means that because of an Injury or Sickness You are completely and continuously unable to perform any work or engage in any occupation"; "**Sickness** means a disease, disorder or condition, which requires treatment by a Physician."[2] (Fetter Decl. Ex. B, at 78.)

### D. Defendant's Denial of Benefits to Plaintiff

One month after Roberto Gonzalez's death, on September 18, 2011, Plaintiff submitted to Defendant a "Proof of Death Form," indicating that her husband died on August 21, 2011. (Fetter Decl. Ex. C, at 3190–95.) Once Defendant received the form, it sent a letter to Plaintiff, requesting additional information. (Fetter Decl. Ex. C, at 3182.) The letter briefly discussed the policy's exclusion of coverage for dependents who are disabled. (*Id.*) Enclosed with the letter was a "Report of Deceased's Disability Prior to Death Form." (*Id.*) The letter instructed Plaintiff that

---

[2] The Court acknowledges that the definition included on page 78 includes the term "You," which does not expressly include a dependent. (*See* Fetter Delc. Ex. B, at 78.) Nevertheless, the definition on page 78 is consistent with the definition of disabled as provided in the exclusion of coverage itself. (*Compare* Fetter Decl. Ex. B, at 18 *with* Ex. B, at 78.)

1  Roberto Gonzalez's physician should complete the form and return it to Defendant.
2  (*Id.*)

3      On November 8, 2011, Dr. James Hwang, Roberto Gonzalez's primary care
4  physician since 2003, completed the "Report of Deceased's Disability Prior to Death
5  Form" that Defendant provided to Plaintiff. (*See* Fetter Decl. Ex. C, at 3180.) Dr.
6  Hwang indicated that Mr. Gonzalez had been disabled since October 2007, when he
7  was diagnosed with liver cancer. He described the disability as well, saying that
8  "Patient had chronic Hepatitis C from unknown etiology. He developed liver
9  cirrhosis and liver cancer diagnosed in 2007. He had been in and out of hospital
10 since then until his pass[ing]." (*Id.*) In response to the question, "Was deceased
11 totally disabled to the extent that he or she was thereby prevented from engaging in
12 any occupation or employment?" Dr. Hwang checked the box indicating "Yes." (*Id.*)
13 In response to the question, "[B]ased upon your knowledge of the deceased's
14 condition prior to his or her death, did such total disability exist continuously from
15 the date he or she first became disabled to the date of his or her death?" Dr. Hwang
16 checked the box indicating "Yes." (*Id.*) Furthermore, Dr. Hwang also indicated that
17 he had "attend[ed] the deceased during the entire period of disability." (*Id.*)

18      On December 1, 2011, Defendant determined that Plaintiff was not entitled to
19 receive benefits under the policy as a result of her husband's death. (Fetter Decl. Ex.
20 C, at 3176–78.) In a letter to Plaintiff, Defendant explained the policy's exclusions
21 of coverage for disabled dependents. (*Id.* at 3176.) It then indicated that "[b]ased on
22 the information provided by [Dr. Hwang], Mr. Gonzalez first became disabled
23 October 2007. His physician notes that his disability was continuous until his
24 death." (*Id.* at 3177.) Defendant concluded that because Plaintiff's "husband was
25 disabled on the effective date of the policy, March 1, 2010, and remained disabled
26 and or confined until his death, no benefits would be payable under this policy."
27 (*Id.*)
28

1   After Defendant denied her claim, Plaintiff appealed its initial decision. (*See*
2   Fetter Decl. Ex. C, at 3165–72.) In her letter of appeal, Plaintiff asserted that,
3   despite his medical condition, her husband "was still able to perform daily activities
4   and was not home and/or bed confined." (Fetter Decl. Ex. C, at 3165.) As proof of
5   this, she explained that "Mr. Gonzalez was actively looking for employment
6   approximately through June 2010[, as] documented in Employment Development
7   Department (EDD) claim forms and payments." (*Id.*)
8   In response, Defendant requested Roberto Gonzalez's medical records so as
9   "to provide [Plaintiff] with a full and fair review of [her] appeal." (Fetter Decl. Ex.
10  C, at 3163.) After reviewing Mr. Gonzalez's medical records, Defendant
11  "determined that the denial of dependent life insurance benefits was appropriate, and
12  no benefits are payable." (Fetter Decl. Ex. C, at 92.) Defendant again explained the
13  policy's exclusion of coverage for disabled dependents. (*Id.* at 92–93.) Defendant
14  then recounted Dr. Hwang's indication that Mr. Gonzalez was totally disabled at the
15  time of his death, and had been since 2007. (*Id.* at 93–94.) Defendant explained that
16  Mr. Gonzalez's extensive medical records confirmed Dr. Hwang's indication. (*Id.* at
17  94.)

## III.   CONCLUSIONS OF LAW

### A.   Legal Standard of Review

20  When Congress enacted ERISA, it did so to protect the "interests of
21  participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b).
22  To this end, ERISA requires employers and plan administrators to provide
23  participants with certain information about their benefits plans. It also permits a
24  participant to file a civil action in federal court to challenge a denial of benefits under
25  a benefits plan. 29 U.S.C. 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S.
26  105, 108 (2008). When presiding over such a cause of action, and reviewing a plan
27  administrator's decision to deny benefits to a participant, a district court applies one
28  of two standards of review: it either reviews the decision *de novo*, or for an abuse of

discretion. The default standard of review is *de novo*. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A court reviews for abuse of discretion where the plan itself provides for it or otherwise grants the administrator discretionary authority to determine a participant's eligibility for benefits. *Metro. Life Ins.*, 554 U.S. at 111. Here, the parties agree that the proper standard of review is *de novo*. (Def.'s Trial Br. 13; Pl.'s Resp. Br. 1.)

Accordingly, the Court must review, without deference, the record to determine whether the plan administrator correctly denied Plaintiff her benefits. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

### B. Interpretation of the Policy

In her response brief, Plaintiff contends that the policy's language is vague and ambiguous and should therefore be construed in her favor.[3] (Pl.'s Resp. Br. 1–2.) The Court does not agree that the policy's language is vague or ambiguous.

When interpreting a policy under ERISA, federal courts apply federal common law. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002). Under the federal common law of ERISA, courts interpret policy terms "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990).

Here, Plaintiff argues that the policy's exclusion for disabled dependents is vague and ambiguous. After quoting the exclusion, Plaintiff asserts that "the Policy contains no definitions of what is meant by, "physically . . . disabled" or what is meant by, "usual and customary duties and activities" or what is meant by, "good health." (Pl.'s Resp. Br. 2.) Then, in obvious hyperbole, Plaintiff contends, "There are as many different reasonable interpretations of those words and phrases as there are people in the world." (Pl.'s Resp. Br. 2.) Clearly, this not true. In fact, Plaintiff fails to propose a more than one possible interpretation for the disputed language.

---

[3] Notably, Plaintiff failed to raise any argument regarding ambiguity in her opening trial brief.

9

1 (*See* Pl.'s Resp. Br. 2–3.)  And the Court is not persuaded by her proposed
2 interpretation.
3      First, the term "physically disabled" is defined in two separate provisions.
4 (*See* Fetter Decl. Ex. B, at 47, 78.[4])  Second, although the terms "usual and
5 customary duties and activities" and "good health" are not defined in the policy, the
6 Court finds that their definitions are not vague or ambiguous.  That is, a person of
7 "average intelligence and experience" would understand that the "usual and
8 customary duties and activities" are those in which the average person would engage,
9 and "good health" is an average person's health who is not inflicted with a serious
10 illness.  Moreover, as applied to the facts of this case, there certainly is no ambiguity.
11 As explained below, the "usual and customary duties" of a 56-year-old man certainly
12 include working and jury duty; and good health certainly does not include liver
13 cirrhosis, liver cancer, and Hepatitis C.  Accordingly, the Court rejects Plaintiff's
14 contention that these terms create an ambiguity.
15      Plaintiff next argues that the clause providing that insurance coverage for a
16 dependent who is disabled as of the policy's effective date "will not take effect ***until***
17 the dependent is able to fully resume all usual and customary duties" is also
18 ambiguous.  (Pl.'s Resp. Br. 2 (emphasis in Plaintiff's brief).)  Plaintiff asserts that
19 because the policy does not say "resume all usual and customary duties *of a person*
20 *who is in the same age and sex who is in good health*," then there is an ambiguity as
21 to what "usual and customary duties" a formerly disabled person must be able to
22 perform.  (*See* Pl.'s Resp. Br. 3.)  The Court rejections Plaintiff's assertion.  The
23 provision is a single sentence and clearly uses parallel structure.  Thus, a person of
24 "average intelligence and experience" would interpret the last part of the provision—
25 "resume all usual and customary duties and activities"—to have the same meaning as

---

[4] The Court again observes that the definition included on page 78 includes the term "You," which does not expressly include a dependent. (*See* Fetter Delc. Ex. B, at 78.)  Nevertheless, the definition on page 78 is consistent with the definition of disabled as provided in the exclusion of coverage itself. (*Compare* Fetter Decl. Ex. B, at 18 *with* Ex. B, at 78.)

10
FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

1   the first part of the provision—"perform all of the usual and customary duties and
2   activities of a person who is the same age and sex who is in good health."
3   Otherwise, under Plaintiff's interpretation, a person who is entirely disabled under
4   the policy because the person cannot work or perform the usual and customary duties
5   and activities of a healthy person of the same age, might yet be eligible if that person
6   can function as well as a person with similar disabilities.  (*See* Pl.'s Resp. Br. 2–3.)
7   This interpretation would be unreasonable and would rob the exclusion of its plain
8   meaning.

9         **C.**      **Whether Defendant Should Have Denied Benefits**

10        Having rejected Plaintiff's assertion that the policy is vague and ambiguous,
11  the Court now turns to whether Defendant correctly denied benefits under the policy.
12  Because the standard of review is *de novo*, Plaintiff bears burden of proving
13  entitlement to benefits.  *Muniz v. Amec Constr. Mgmt. Inc.*, 623 F.3d 1290, 1294 (9th
14  Cir. 2010).  Plaintiff has failed to meet this burden.  First, the evidence that Plaintiff
15  relies on is very limited and any inference to be made in her favor is weak.  Second,
16  Defendant points to evidence in the administrative record that entirely undermines
17  any favorable inference that can be made from the evidence proffered by Plaintiff.
18        To show that she is entitled to benefits under the policy, Plaintiff presents
19  evidence that could suggest Mr. Gonzalez was able to "perform all of the usual and
20  customary duties and activities" of a 56-year-old male and that he was "able to
21  engage in [] work or occupation for wage or profit."  For example, she points to the
22  letter of appeal she sent to Defendant after her claim was initially denied.  (Pl.'s Tr.
23  Br. Ex. E.)  In that letter, *she* asserted, "Although Mr. Gonzalez had a medical
24  condition dated since October 2007, he was still able to perform daily activities and
25  was not home and/or bed confined."  (Pl.'s Tr. Br. Ex. E.)  Even if the Court were to
26  find Plaintiff credible, this assertion does not necessarily demonstrate that she is
27  entitled to benefits.  That is, even if Mr. Gonzalez was able to perform daily
28  activities and was not confined to his bed or home, it does not necessarily mean he

1  was not disabled; it does not mean he was able to "perform all of the usual and
2  customary duties and activities" of a 56-year-old male or that he was "able to engage
3  in [] work or occupation for wage or profit."  In other words, the scope of Plaintiff's
4  assertion in her letter of appeal is more narrow than the requirements for eligibility
5  under the policy.  Moreover, Plaintiff is an interested party.  If the Court finds that
6  Mr. Gonzalez was not disabled as of the policy's effective date, Plaintiff stands to
7  gain the $50,000 policy amount.  This bias detracts from Plaintiff's credibility.
8         Plaintiff also presents evidence that Mr. Gonzalez was receiving
9  unemployment benefits as of the policy's effective date.  (Pl.'s Tr. Br. Ex. E.)  This
10 evidence comprises an Internal Revenue Service tax form indicating that Mr.
11 Gonzalez received $6,504 in unemployment benefits during 2010, and two
12 Employment Development Department letters from February 2010 explaining that
13 Mr. Gonzalez had automatically qualified for a third extension in unemployment
14 benefits, due to legislation signed by President Barack Obama.  (Pl.'s Tr. Br. Ex. E.)
15 From this evidence, Plaintiff asks the Court to infer that Mr. Gonzalez was actively
16 seeking work and therefore was not disabled because he was "able to engage in []
17 work or occupation for wage or profit."[5]  Although this would be a reasonable
18 inference, it certainly is not conclusive evidence that Mr. Gonzalez was not disabled.
19        Finally, Plaintiff points to notes in Mr. Gonzalez's medical records reflecting
20 his health status.  During his December 2009 stay at the hospital (due to repeatedly
21 vomiting blood), doctors noted that he did not have any "active bleeding" and had
22 "no infections."  (Fetter Decl. Ex. C, at 1569.)  When discharged, he was "[s]table
23 and improved [and] [a]ble to walk with no problem," and his recommended activity
24 level was "as tolerated." (Fetter Decl. Ex. C, at 1570.)  Additionally, doctors
25 encouraged him to "[k]eep [him]self active to avoid infection and deconditioning."
26 The records also indicate that prior to being admitted to the hospital, Mr. Gonzalez's

---

28 [5] At trial, the parties agreed that, to receive unemployment benefits, a person must affirm that the person is physically able to work.

1  mental status was "Alert and Oriented" and his "Prior Activities of Daily Living:
2  Independent."  (Pl.'s Tr. Br. 3.)  Upon discharge after his April 2010 hospital stay,
3  Mr. Gonzalez's medical records reflect that his condition at the time of discharge
4  was stable and his functional status was "[a]mbulatory with no restrictions."  (Fetter
5  Decl. Ex. C, at 1311.)  From this evidence, Plaintiff asks the Court to infer that her
6  husband was eligible under the policy because he was "perform all of the usual and
7  customary duties and activities" of a 56-year-old male in good health.  True as it may
8  be that a healthy 56-year-old male is able to walk with no problem, and is
9  ambulatory with no restrictions, it does not necessarily mean Mr. Gonzalez could
10 "perform all of the usual and customary duties and activities" of a 56-year-old male
11 in good health.  Accordingly, even if there is some inference to be made in Plaintiff's
12 favor in this respect, it is limited.
13       When considering the rebuttal evidence provided by Defendant, any favorable
14 inference for Plaintiff is entirely diminished.  For example, Mr. Gonzalez's disability
15 is evident from the "Report of Deceased's Disability Prior to Death" form that Dr.
16 James Hwang prepared.  Dr. Hwang indicated that since 2007 and until the date of
17 his death, due to his "chronic Hepatitis C" and "liver cirrhosis and liver cancer," Mr.
18 Gonzalez was "totally disabled to the extent that he . . . was thereby prevented from
19 engaging in any occupation or employment."  (Fetter Decl. Ex. C, at 3180.)  Dr.
20 Hwang also explained that Mr. Gonzalez "had been in and out of the hospital since
21 [his diagnosis in 2007] until his pass[ing]."  (*Id.*)  This is the most direct evidence in
22 the record regarding Mr. Gonzalez's disability and therefore eligibility for coverage
23 under the policy.  Therefore, this evidence is highly relevant to the Court's analysis.
24       Plaintiff's attempt to disparage the significance of the form that Dr. Hwang
25 prepared is unavailing.  (Pl.'s Tr. Br. 6:9–11.)  She argues that it is Defendant's
26 "own, self-serving" form.  (*Id.*)  But she neglects to consider that it was Dr.
27 Hwang—a neutral third party—who prepared it.  The Court rejects Plaintiff's
28 contention that Dr. Hwang's assessment and opinion is any less objective because

13
FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

Defendant provided the form on which it was given.  The Court also rejects Plaintiff's assertion that her opinion would be objective, let alone the most objective, or even more objective than Dr. Hwang's.  (*See* Pl.'s Resp. Br. 2.)  As discussed above, Plaintiff has a significant interest in the outcome of this case.  Dr. Hwang, on the other hand, has no interest, and is therefore able to be more objective.  Thus, the Court finds Dr. Hwang more credible than Plaintiff.

Moreover, a long medical record supports Dr. Hwang's assessment.  Shortly before the insurance policy was to become effective, Mr. Gonzalez's doctor affirmed that his liver cancer was untreatable by surgery, and his prognosis was poor.  (Fetter Decl. Ex. C, at 1579–80.)  Only a month and a half later, Mr. Gonzalez and his doctors were discussing advance care planning and home palliative care—meaning they were not attempting to cure his conditions, but only alleviate the symptoms.  (*See* Fetter Decl. Ex. C, at 993–1002.)

Furthermore, it is undisputed that, long before the time the policy was to become effective, Mr. Gonzalez was not working.  (Fetter Decl. Ex. C, at 3165.)  It also appears that he was too ill to attend jury duty.  There is a note in the medical records indicating that Mr. Gonzalez's "jury duty form is ready."  (Fetter Decl. Ex. C, at 2559.)  At trial, Plaintiff argued that no inference could be made from this note.  According to Plaintiff, the note could have been for anything, including merely for a cushion to sit on during jury duty.  The Court does not agree.  Only a month and a half prior, Mr. Gonzalez was hospitalized in serious condition.  (*See, e.g.*, Fetter Decl. Ex. C, at 1557–63.)  Eleven days prior, Mr. Gonzalez underwent an endoscopic procedure to treat sores in his esophagus.  (Fetter Decl. Ex. C, at 1939–40.)  Finally, eight days after the jury duty note was "ready", Dr. Kashani affirmed that Mr. Gonzalez's liver cancer was "unresectable" and his prognosis "poor".  (Fetter Decl. Ex. C, at 2579–80.)  Accordingly, the Court holds that the reasonable inference is that Mr. Gonzalez needed a "jury duty form" because he was too ill to attend jury duty; that is, the doctors prepared a form to excuse Mr. Gonzalez from jury duty.

1  Thus, not only was Mr. Gonzalez not working, he was not well enough to attend jury
2  duty—as of February 16, 2010, only two weeks prior to the policy's effective date.
3  (Fetter Decl. Ex. C, at 2559–60.)  As such, the Court has no reason to doubt Dr.
4  Hwang's assessment that Mr. Gonzalez was unable to work because of his disability.
5       In sum, Plaintiff has failed to bear her burden of demonstrating entitlement to
6  benefits under the policy.  The reasonable conclusion from the evidence provided is
7  that Roberto Gonzalez was ineligible for coverage under the policy as of the date
8  coverage was to commence, March 1, 2010.  His ineligibility arose due to a disability
9  that prevented him from being able to work for wage or profit or perform the usual
10 and customary duties and activities of a 56-year-old man.  Furthermore, the evidence
11 most reasonably suggests that Mr. Gonzalez remained ineligible, as his disability
12 continued until the day he died.  Accordingly, upon Mr. Gonzalez's death, no
13 benefits were payable under the policy, and consequently Defendant correctly denied
14 Plaintiff's claim.
15      Judgment is for Defendant.

**IT IS SO ORDERED.**

Dated:  July 21, 2014          _____
                                  HONORABLE BEVERLY REID O'CONNELL
                                  UNITED STATES DISTRICT COURT JUDGE